DAVID M. JOLLEY (SBN 191164)
Email:  djolley@donahue.com
DONAHUE FITZGERALD LLP
1999 Harrison Street, 26th Floor
Oakland, California 94612-3520
Telephone: (510) 451-3300
Facsimile:  (510) 451-1527

Attorneys for Defendant
TOOTSIE ROLL INDUSTRIES, INC.

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| MAXINE BEASLEY, on behalf of herself and all others similarly situated,<br><br>    Plaintiff,<br><br>    v.<br><br>TOOTSIE ROLL INDUSTRIES, INC.,<br><br>    Defendant. | Civil Case No.:<br><br>**DECLARATION OF DAVID M. JOLLEY IN SUPPORT OF DEFENDANT TOOTSIE ROLL INDUSTRIES, LLC'S NOTICE OF REMOVAL**<br><br>Complaint filed:  January 25, 2021<br>Complaint Served:  February 2, 2021 |

I, David M. Jolley, declare and state as follows:

1.   I am a partner in the law firm of Donahue Fitzgerald LLP.  I am one of the attorneys representing defendant Tootsie Roll Industries, Inc. ("Tootsie Roll") in the above-captioned suit.  I have personal knowledge of the matters stated herein and, if called upon, could competently testify thereto.

2.   On January 25, 2021, plaintiff Maxine Beasley filed this action in the Superior Court of the State of California, County of Alameda.  A true and correct copy of the Complaint is attached hereto as **Exhibit A**.

3.   Plaintiff's counsel served Tootsie Roll with the Summons and Complaint on February 2, 2021.

4.   In addition to the Summons and Complaint, the following additional documents have been entered on the docket in this case in the California Superior Court for the County of Alameda:  a Civil Case Cover Sheet; an Order Setting Case Management Conference; a Proof of Service on Complaint as to Tootsie Roll Industries, Inc., and a Proof of Service by Email.

5.   A true and correct copy of the Summons served on Tootsie Roll is attached to the Jolley Declaration as **Exhibit B**.

6.   A true and correct copy of the Civil Case Cover Sheet is attached to the Jolley Declaration as **Exhibit C**.

7.   A true and correct copy of the Order Setting Case Management Conference is attached to the Jolley Declaration as **Exhibit D**.

8.   A true and correct copy of the Proof of Service on Complaint as to Tootsie Roll Industries, Inc. is attached to the Jolley Declaration as **Exhibit E**.

9.   A true and correct copy of the Proof of Service by Email is attached to the Jolley Declaration as **Exhibit F**.

DECLARATION OF DAVID M. JOLLEY IN SUPPORT OF NOTICE OF REMOVAL

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on February 23, 2021, in El Sobrante, California.


By:  */s/David M. Jolley*_____
David M. Jolley

# EXHIBIT A

**THE WESTON FIRM**
GREGORY S. WESTON (239944)
*greg@westonfirm.com*
1405 Morena Blvd., Suite 201
San Diego, CA 92110
Telephone:　　(619) 798-2006
Facsimile:　　(619) 343-2789

<u>**Counsel for Plaintiff**</u>

FILED BY FAX
ALAMEDA COUNTY

January 25, 2021

CLERK OF
THE SUPERIOR COURT
By Shabra Iyamu, Deputy

CASE NUMBER:
RG21086723

**SUPERIOR COURT FOR THE STATE OF CALIFORNIA**

**FOR THE COUNTY OF ALAMEDA**

| | |
|---|---|
| MAXINE BEASLEY on behalf of herself and all others similarly situated,<br><br>　　　　Plaintiff,<br><br>　v.<br><br>TOOTSIE ROLL INDUSTRIES, INC.,<br><br>　　　　Defendant. | Case No:<br><br>Pleading Type: Class Action<br><br>**CLASS ACTION COMPLAINT VIOLATIONS OF THE UNFAIR COMPETITION LAW AND BREACH OF IMPLIED WARRANTY**<br><br><u>**No Jury Demand**</u> |

CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

I.      JURISDICTION AND VENUE ............................................................................... 1

II.     NATURE OF THE ACTION ................................................................................... 1

III.    PARTIES .................................................................................................................. 2

IV.     NATURE OF TRANS FAT ...................................................................................... 2

    A.      There Is a Well-Established Scientific Consensus That Trans Fat Is Extremely Harmful. ............................................................................................................ 3

    B.      The Artificial Trans Fat in Tootsie Products Caused Cardiovascular Disease. ................... 5

    C.      The Artificial Trans Fat in Tootsie Products Caused Type-2 Diabetes. ............................. 7

    D.      The Artificial Trans Fat in Tootsie Products Caused Breast, Prostate, and Colorectal Cancer. ............................................................................................ 7

    E.      The Artificial Trans Fat in Tootsie Products Caused Alzheimer's Disease and Cognitive Decline. ................................................................................................ 8

    F.      The Artificial Trans Fat in Tootsie Products Caused Organ Damage. ............................... 9

    G.      PHO Use is Unlawful in California, the United States, and European Nations. ................ 10

V.      PLAINTIFF'S PURCHASES OF TOOTSIE PRODUCTS ................................... 11

VI.     THE USE OF PHO IN TOOTSIE PRODUCTS WAS UNFAIR .......................... 11

VII.    DEFENDANT'S PRACTICES WERE "UNLAWFUL" WITHIN THE MEANING OF THE CALIFORNIA UNFAIR COMPETITION LAW ...................................... 12

VIII.   INJURY ................................................................................................................. 14

IX.     DELAYED DISCOVERY .................................................................................... 15

X.      CLASS ACTION ALLEGATIONS ....................................................................... 15

XI.     PRAYER FOR RELIEF ....................................................................................... 19

XII.    NO JURY DEMAND ........................................................................................... 19

Plaintiff Maxine Beasley, on behalf of herself, all others similarly situated, and the general public, by and through her undersigned counsel, hereby sues Defendant Tootsie Roll Industries Inc. ("Tootsie Industries" or "Defendant"), and upon information and belief and investigation of counsel, alleges as follows:

## I.    JURISDICTION AND VENUE

1.      Jurisdiction is proper because Plaintiff is a citizen of California and because all claims are asserted under the laws of California and relate to a product that is sold in California and purchased by Plaintiff in California.

2.      Venue is proper because Defendant conducts continuous business, sold thousands of the product at issue, and thousands of class members reside in the County of Alameda.

## II.    NATURE OF THE ACTION

3.      Defendant manufactures, distributes, and sells Tootsie Rolls and Tootsie Pops (collectively "Tootsie Products"), which contained partially hydrogenated oil ("PHO").

4.      Artificial trans fat is a toxin and carcinogen for which there are many safe and commercially viable substitutes. During the class period, Defendant added artificial trans fat to Tootsie Products in the form of partially hydrogenated oil ("PHO")

5.      On June 17, 2015, the FDA determined that PHO is unsafe for use in food. Final Determination Regarding Partially Hydrogenated Oils, 80 Fed. Reg. 34650 (June 17, 2015). Yet Defendant continued to incorporate this illegal, dangerous additive into Tootsie Products, even after the FDA tentatively (in 2013), and then finally declared it unsafe for use in food, rendering products made with PHO unlawful and adulterated.

6.      Even before the FDA's Final Determination, however, PHO was an unlawful food additive under both California and federal law.

7.      Although safe, low-cost, and commercially acceptable alternatives to PHO existed throughout the class period, Defendant unfairly elected *not* to use these safe alternatives in Tootsie Products in order to increase profit at the expense of the health of consumers.

8.      Plaintiff Maxine Beasley purchased Tootsie Products from California grocery stores during the Class Period defined herein, for her personal and household consumption.

9.      This action is brought to remedy Defendant's unfair and unlawful conduct. On behalf of the class defined herein, Plaintiff seeks an order compelling Defendant to, *inter alia*: (1) award Plaintiff and the Class members restitution and (2) pay costs, expenses, and reasonable attorneys' fees.

### III.     PARTIES

1.      Defendant Tootsie Industries is a Virginia corporation headquartered in Chicago, Illinois. Tootsie Products are sold in stores throughout California.

2.      Tootsie Industries owns, manufactures, distributes, and sells the Tootsie Products.

3.      Plaintiff Maxine Beasley is a citizen of California who repeatedly purchased the Tootsie Products for personal and household consumption.

### IV.     NATURE OF TRANS FAT

4.      Artificial trans fat is manufactured via an industrial process called partial hydrogenation, in which hydrogen atoms are added to normal vegetable oil by heating the oil to temperatures above $400°F$ in the presence of ion donor catalyst metals such as rhodium, ruthenium, and nickel.[1] The resulting product is known as partially hydrogenated oil, or PHO.

5.      PHO was invented in 1901 and patented in 1902 by German chemist Wilhelm Normann. PHO molecules chemically differ from the natural fat molecules in other food products.[2]

6.      Natural fat, except the trace amounts of natural trans fat from ruminant animal sources like beef, milk, and mutton, comes in two varieties: (1) fats that lack carbon double bonds ("saturated fat"); and (2) fats that have carbon double bonds. Trans fat, in contrast to cis fat, has carbon double bonds with hydrogen atoms on opposite sides of the carbon chain.

---

[1] *See* Alice H. Lichtenstein, *Trans Fatty Acids, Plasma Lipid Levels, and Risk of Developing Cardiovascular Disease*, 95 CIRCULATION 2588, 2588-90 (1997).

[2] *See* Alberto Ascherio et al., *Trans Fatty Acids & Coronary Heart Disease*, 340 NEW ENG. J. MED. 94, 94-8 (1999). *See also* Walter Willett, *The Scientific Case for Banning Trans Fats*, Scientific American, *available at* www.scientificamerican.com/article/the-scientific-case-for-banning-trans-fats/ (last visited January 21, 2021).



7.      PHO was initially a "wonder product" attractive to the processed food industry because it combined the low cost of unsaturated *cis* fat with the flexibility and long shelf life of saturated fat. Like processed *cis* fat, PHO is manufactured from low-cost legumes,[3] while saturated fat is derived from relatively expensive animal and tropical plant sources.[4]

8.      As detailed herein, PHO causes cardiovascular disease, diabetes, cancer, and Alzheimer's disease, and accelerates memory damage and cognitive decline. These risks were well known during the entire class period, and at no point during the class period was there ever a consensus that PHO was safe to use, neither in general nor as an ingredient in candy.

9.      In using PHO as a food additive prior to 2015, Defendant failed to submit a food additive petition and failed to undertake a GRAS self-determination.

A.      **There Is a Well-Established Scientific Consensus That Trans Fat Is Extremely Harmful.**

10.     The National Academies of Science were charted by an act of Congress, signed by President Lincoln in 1863. Under that charter, in 1970, the National Academy of Medicine was created. In a 2005 report, under its former name of the Institute of Medicine, it concluded there was "no safe level" of PHO or artificial trans fat intake.[5] Therefore, in 2005, there was no consensus that PHO was a safe ingredient to use in food. To the contrary, the consensus was that it is unsafe.

11.     In addition, "trans fatty acids are not essential and provide no known benefit to human

---

[3] e.g., corn oil, cottonseed oil, soybean oil, peanut oil

[4] e.g., butter, cream, tallow, palm oil, coconut oil

[5] Food & Nutrition Bd., Inst. of Med., *Dietary Reference Intakes For Energy, Carbohydrate, Fiber, Fat, Fatty Acids, Cholesterol, Protein, and Amino Acids* (2005).

health."[6] Thus, while IOM provided safe maximum levels for other food elements like saturated fat, in could not and declined to provide one for trans fat when requested by the FDA, the reason being that "**any** incremental increase in trans fatty acid intake increases the risk of CHD." *Id.* (emphasis added).

12.    In 2006, Dariush Mozaffarian of Harvard Medical School wrote in the New England Journal of Medicine, "the consumption of trans fatty acids results in considerable potential harm but no apparent benefit."[7]

13.    Julie Louise Gerberding, who served eight years as the head of the United States Centers for Disease Control and Prevention, wrote in 2009:

> The scientific rationale for eliminating exposure to artificial trans fatty acids in foods is rock solid. There is no evidence that they provide any health benefit, and they are certainly harmful. These compounds adversely affect both low- and high-density lipoprotein cholesterol levels and increase the risk for coronary heart disease, even at relatively low levels of dietary intake. Gram for gram, trans fats are far more potent than saturated fats in increasing the risk for heart disease, perhaps because they also have pro-inflammatory properties and other adverse effects on vascular endothelium . . . Eliminating exposure to these dangerous fats could have a powerful population impact—potentially protecting 30,000 to 100,000 Americans from death related to heart disease each year.[8]

14.    Dr. Mozaffarian further writes:

> Given the adverse effects of trans fatty acids on serum lipid levels, systemic inflammation, and possibly other risk factors for cardiovascular disease and the positive associations with the risk of CHD, sudden death from cardiac causes, and possibly diabetes, the potential for harm is clear. The evidence and the magnitude of adverse health effects of trans fatty acids are in fact far stronger on average than those of food contaminants or pesticide residues, which have in some cases received considerable attention.[9]

15.    In 2011, Walter Willet, also a professor at Harvard Medical School, described Defendant's

---

[6] *Food Labeling; Health Claim; Phytosterols and Risk of Coronary Heart Disease; Proposed Rule*, 75 Fed. Reg. 76526, 76542 (Dec. 8, 2010).

[7] Dariush Mozaffarian et al., *Trans Fatty Acids and Cardiovascular Disease*, 354 N. ENGL. J. MED. 1601, 1608-1609 (2006).

[8] Julie Louise Gerberding, *Safer Fats for Healthier Hearts: The Case for Eliminating Dietary Artificial Trans Fat Intake*, 151 ANN. INTERN. MED. 137-138 (2009).

[9] Dariush Mozaffarian et al., *Trans Fatty Acids and Cardiovascular Disease*, 354 N. ENGL. J. MED. 1601 (2006).

behavior of selling food made with PHO as "a food safety issue . . . this is actually contamination."[10]

16.     The views of these experts, and many others, show that, even before the FDA formally declared PHO to be unsafe for use in food in 2015, its use was still unlawful because there was not a consensus of scientific experts that PHO was a safe food additive.

**B.     The Artificial Trans Fat in Tootsie Products Caused Cardiovascular Disease.**

17.     Trans fat raises the risk of CHD more than any other known consumed substance.[11]

18.     A 1999 estimate published in the New England Journal of Medicine found that removing PHO from the American diet "would prevent approximately 30,000 premature coronary deaths per year, and epidemiologic evidence suggests this number is closer to 100,000 premature deaths annually."[12]

19.     By raising LDL levels and lowering HDL levels, trans fat causes a wide variety of dangerous heart conditions, including vasodilation, coronary artery disease, and primary cardiac arrest.

20.     In a joint Dietary Guidelines Advisory Committee Report, the Department of Health and Human Services and the U.S. Department of Agriculture recognized "[t]he relationship between trans fatty acid intake and LDL cholesterol is direct and progressive, increasing the risk of cardiovascular disease."[13]

21.     The American Heart Association warns, "trans fats raise your bad (LDL) cholesterol levels and lower your good (HDL) cholesterol levels. Eating trans fats increases your risk of developing heart disease."[14]

22.     Even further back, in 2003, a review of literature on the connection between the consumption of artificial trans fat and coronary heart disease, the FDA concluded:

[B]ased on the consistent results across a number of the most persuasive types of study

---

[10] Rebecca Coombes, *Trans fats: chasing a global ban*, 343 BRITISH MED. J. (2011).

[11] Mozaffarian, 354 NEW ENG. J. MED. at 1603.

[12] Alberto Ascherio et al., *Trans Fatty Acids & Coronary Heart Disease*, 340 NEW ENG. J. MED. 94, 94-8 (1999).

[13] Dep't of Health & Human Serv. & U.S. Dep't of Agric., 2005 Dietary Guidelines Advisory Committee Report, Section 10 (2005).

[14] Am. Heart Ass'n., *Trans Fats, available at* https://www.heart.org/en/healthy-living/healthy-eating/eat-smart/fats/trans-fat (last visited January 21, 2021).

designs (i.e., intervention trials and prospective cohort studies) that were conducted using a range of test conditions and across different geographical regions and populations . . . the available evidence for an adverse relationship between trans fat intake and CHD risk is strong.[15]

23.     The FDA concluded in 2010 that "there have been no reports issued by authoritative sources that provide a level of trans fat in the diet . . . below which there is no risk of [Coronary Heart Disease]." 75 Fed. Reg. 76526, 76542 (Dec. 8, 2010). Rather, there "is a positive linear trend between trans fatty acid intake and LDL cholesterol concentration, and therefore there is a positive relationship between trans fatty acid intake and the risk of CHD." *Id.*

24.     A study published in American Heart Association's *Circulation* found that the largest consumers of trans fat have three times the risk of suffering primary cardiac arrest, even after controlling for a variety of medical and lifestyle risk factors.[16]

25.     Australian researchers observed that heart attack patients possess elevated amounts of trans fat in their adipose tissue (stored body fat) compared to controls. The effects of consuming trans fat are therefore shown to be long-lived because of its storage within the body in place of natural fats.[17]

26.     Cholesterol dysregulation and systemic inflammation/immune system dysregulation are the most important pathways through which PHO consumption causes morbidity and death. Another route is by promoting atherosclerosis by degrading the function of TGF-β, a protein responsible for preventing the development of atherosclerotic lesions.[18]

27.     TGF-β also functions to suppress cancerous tumors. Degradation of TGF-β function is also likely one route by which artificial trans fat consumption promotes cancers in fatty organs and the digestive system. *Id.*

---

[15] FDA, Final Rule, 68 Fed. Reg. 41433, 41445 (July 11, 2003).

[16] Rozenn N. Lemaitre et al., *Cell Membrane Trans-Fatty Acids and the Risk of Primary Cardiac Arrest*, 105 CIRCULATION 697, 697-701 (2002).

[17] Peter M. Clifton et al., *Trans Fatty Acids In Adipose Tissue And The Food Supply Are Associated With Myocardial Infarction*. 134 J. NUTR. 874, 874-79 (2004).

[18] Chen, C.L. et al., *A mechanism by which dietary trans fats cause atherosclerosis*, J. NUTR. BIOCHEMISTRY 22(7) 649-655 (2011).

**C.** **The Artificial Trans Fat in Tootsie Products Caused Type-2 Diabetes.**

28.     Artificial trans fat also causes type-2 diabetes.[19]

29.     In particular, trans fat disrupts the body's glucose and insulin regulation system by incorporating itself into cell membranes, causing the insulin receptors on cell walls to misform and malfunction, and in turn elevating blood glucose levels and stimulating further release of insulin.

30.     Researchers at Northwestern University's medical school found that mice show multiple markers of type-2 diabetes after eating PHO for only four weeks.[20]

31.     By the eighth week of the study, mice fed the high trans fat diet showed a 500% increase compared to the control group in hepatic interleukin-1β gene expression, one such marker of diabetes, indicating the extreme stress even short-term exposure to artificial trans fat places on the body. *Id.*

32.     A 14-year study of 84,204 women found that for every 2 percent increase in energy intake from artificial trans fat, the relative risk of type-2 diabetes was increased by 39 percent.[21]

**D.** **The Artificial Trans Fat in Tootsie Products Caused Breast, Prostate, and Colorectal Cancer.**

33.     Trans fat is a carcinogen which causes breast, prostate, and colorectal cancer.

34.     A 13-year study of 19,934 French women showed 75 percent more women contracted breast cancer in the highest quintile of trans fat consumption than did those in the lowest.[22]

35.     In a 25-year study of 14,916 American physicians, those in the highest quintile of trans fat consumption had more than double the risk of developing prostate cancer than the doctors in the lowest

---

[19] Am. Heart Ass'n., *Trans Fats*, *available at* https://www.heart.org/en/healthy-living/healthy-eating/eat-smart/fats/trans-fat (last visited January 21, 2021).

[20] Sean W. P. Koppe et al., *Trans fat feeding results in higher serum alanine aminotransferase and increased insulin resistance compared with a standard murine high-fat diet*, 297 AM. J. PHYSIOL. GASTROINTEST LIVER PHYSIOL. 378 (2009).

[21] Jorge Salmeron et al., *Dietary Fat Intake and Risk of Type 2 Diabetes in Women*, 73 AM. J. CLINICAL NUTRITION 1019, 1023 (2001).

[22] Véronique Chajès et al., *Association between Serum Trans-Monounsaturated Fatty Acids and Breast Cancer Risk in the E3N-EPIC Study*. 167 AM. J. EPIDEMIOLOGY 1312, 1316 (2008).

quintile.[23]

36.     A study of 1,012 American males observing trans fat intake and the risk of prostate cancer found "[c]ompared with the lowest quartile of total trans-fatty acid consumption, the higher quartiles gave odds ratios (ORs) equal to 1.58," meaning those in the highest quartile are 58% more likely to contract prostate cancer than those in the lowest.[24]

37.     A 600-person study found an 86 percent greater risk of colorectal cancer in the highest trans fat consumption quartile.[25]

38.     A 2,910-person study found "trans-monounsaturated fatty acids . . . were dose-dependently associated with colorectal cancer risk," which showed "the importance of type of fat in the etiology and prevention of colorectal cancer."[26]

**E.     The Artificial Trans Fat in Tootsie Products Caused Alzheimer's Disease and Cognitive Decline.**

39.     Trans fat causes Alzheimer's disease and cognitive decline.

40.     In a study examining 815 Chicago area seniors, researchers found "increased risk of incident Alzheimer disease among persons with high intakes of . . . trans-unsaturated fats."[27]

41.     The study "observed a strong increased risk of Alzheimer disease with consumption of trans-unsaturated fat." *Id.*

42.     In a study of 1,486 women with type-2 diabetes, researchers found "[h]igher intakes of . . .

---

[23] Jorge Chavarro et al., *A Prospective Study of Blood Trans Fatty Acid Levels and Risk of Prostate Cancer.* 47 PROC. AM. ASSOC. CANCER RESEARCH 95, 99 (2006).

[24] Xin Liu et al., *Trans-Fatty Acid Intake and Increased Risk of Advanced Prostate Cancer: Modification by RNASEL R462Q Variant*, 28 CARCINOGENESIS 1232, 1232 (2007).

[25] L.C. Vinikoor et al., *Consumption of Trans-Fatty Acid and its Association with Colorectal Adenomas*, 168 AM. J. EPIDEMIOLOGY 289, 294 (2008).

[26] Evropi Theodoratou et al., *Dietary Fatty Acids and Colorectal Cancer: A Case-Control Study*, 166 AM. J. EPIDEMIOLOGY 181 (2007).

[27] Martha Clare Morris et al., *Dietary Fats and the Risk of Incident Alzheimer Disease*, 60 ARCH. NEUROL. 194, 198-99 (2003).

trans fat since midlife . . . were [] highly associated with worse cognitive decline . . . ."[28]

43.    The study cautioned "[d]ietary fat intake can alter glucose and lipid metabolism and is related to cardiovascular disease risk in individuals with type 2 diabetes. Because insulin, cholesterol, and vascular disease all appear to play important roles in brain aging and cognitive impairments, dietary fat modification may be a particularly effective strategy for preventing cognitive decline, especially in individuals with diabetes." *Id.* (citations omitted).

44.    Artificial trans fat also damages the brains of those who consume it. A study conducted by UCSD School of Medicine of 1,018 men, mostly younger men, found trans fat consumption to be strongly correlated with impaired memory.[29] The authors of the study, appearing in *Circulation*, the American Heart Association's peer-reviewed journal, conclude that "[gr]eater dTFA [dietary trans fatty acid] was significantly associated with worse word memory in adults aged 20-45 years, often critical years for career building."

45.    Performing a word memory test, each additional gram per day of trans fat consumed was associated with 0.76 fewer words correctly recalled. The authors suggest trans fat's well-established pro-oxidant effect and its damage to cell energy processes is the pathway by which trans fat consumption damages memory ability. The young men with the highest trans fat consumption scored 12 fewer recalled words on the 104-word test. *Id.*

F.    **The Artificial Trans Fat in Tootsie Products Caused Organ Damage.**

46.    Artificial trans fat molecules are readily incorporated into blood and organ cells in place of natural fat molecules, which damages vital organs, including the heart, brain, and reproductive system. Further, changing the chemical composition of cells induces systemic inflammation, where the immune system fails to recognize such cells as native to the body and becomes persistently overactive, leading to further organ damage.[30]

---

[28] Elizabeth E. Devore et al., *Dietary Fat Intake and Cognitive Decline in Women with Type 2 Diabetes*, 32 DIABETES CARE 635 (2009).

[29] Golomb, B. et al., *Trans Fat Consumption is Adversely Linked to Memory in Working-Age Adults*, CIRCULATION. 130:A15572 (2014).

[30] *See*:

### G.    PHO Use is Unlawful in California, the United States, and European Nations.

47.    New York City banned trans fat in restaurants in 2006.

48.    A 2004 Danish law restricted all foods to fewer than 2 percent of calories from artificial trans fat, a test that Tootsie Rolls and Tootsie Pops did not meet during the class period.

49.    Switzerland passed the same restriction in 2008.[31]

50.    A study of Denmark's 2004 trans fat ban concluded it "did not appreciably affect the quality, cost or availability of food" and did not have "any noticeable effect for the consumers."[32]

51.    These laws were all motivated by the strong evidence trans fat is dangerous, showing there was not a scientific consensus during the class period that PHO was a safe food additive.

52.    On June 17, 2015, the FDA released a declaratory order which it called its Final Determination Regarding Partially Hydrogenated Oils, finding that "PHOs are not GRAS for any use in human food." 80 Fed. Reg. 34650, 34651 (June 17, 2015) ("Final Determination").

53.    The FDA's Final Determination noted that "if there are data and information that demonstrates to a reasonable certainty that no harm will result from a specific use of a PHO in food, that information could be submitted as part of a food additive petition to FDA seeking issuance of a regulation to prescribe conditions under which the additive may be safely used in food." Final Determination at 34664.

54.    On June 11, 2015 and March 7, 2017, the Grocery Manufacturers Association ("GMA") submitted such a food additive petition and then an amended petition seeking approval to use partially

Lopez-Garcia et al., *Consumption of Trans Fat is Related to Plasma Markers of Inflammation and Endothelial Dysfunction*, 135 J. NUTR. 562-66 (2005);

Baer et al., *Dietary fatty acids affect plasma markers of inflammation in healthy men fed controlled diets; a randomized crossover study*, 79 AM. J. CLIN. NUTR. 969-73 (2004);

Mozaffarian & Clarke, *Quantitative effects on cardiovascular risk factors and coronary heart disease risk of replacing partially hydrogenated vegetable oils with other fats and oils*, 63 EURO. J. CLIN. NUTR. S22-33 (2009);

Mozaffarian et al., *Trans Fatty acids and systemic inflammation in heart failure*, 80 AM. J. CLIN. NUTR. 1521-25 (2004).

[31] Andrew Collier, *Deadly Fats: Why Are We still Eating Them?*, The Independent (UK), June 10, 2008.

[32] Mozaffarian, 354 NEW ENG. J. MED. at 1610; *see also* Steen, Stender, *High Levels of Industrially Produced Trans Fat in Popular Fast Food*, 354 NEW ENG. J. MED. 1650, 1652 (2006).

1  hydrogenated oil in "approximately 60 food categories." On May 21, 2018, the FDA denied the

2  amended GMA petition, and stated it considered the first one abandoned. In doing so, the FDA rejected

3  the GMA's argument for a "non-linear dose response" model and noted that "the vast majority of

4  scientific studies have been consistent in their conclusions that trans fat consumption has a progressive

5  and linear adverse effect on blood lipids and CHD risk." Denial of Food Additive Petition, 83 Fed. Reg.

6  23382, 23390 (May 21, 2018).

7                    **V.     PLAINTIFF'S PURCHASES OF TOOTSIE PRODUCTS**

8          55.     Plaintiff Maxine Beasley regularly purchased, consumed, and shared the Tootsie Products

9  during the Class Period.

10         56.     The most frequent locations of Plaintiff's purchases of the Tootsie Products were at the

11  Walgreens located at 2238 Westborough Blvd., South San Francisco, CA 94080. She purchased them

12  less often at other retailers. During the Class Period she spent about $150 on Tootsie Products

13  containing PHO.

14         57.     Plaintiff consumed a dangerous amount of an illegal and dangerous food additive.

15                 **VI.     THE USE OF PHO IN TOOTSIE PRODUCTS WAS UNFAIR**

16         58.     Defendant's use of PHO in Tootsie Products was always unnecessary. There were several

17  safe substitutes for PHO and artificial trans fat throughout the Class Period.

18         59.     During the Class Period, most manufacturers of competing candy products responsibly

19  decided to refrain from adding artificial trans fat to their products.

20         60.     Although commercially viable alternative formulations and substitutes for PHO were

21  available, Defendant elected not to use them in Tootsie Products in order to increase its profits at the

22  expense of consumers' health.

23         61.     Defendant's practices as described herein were "unfair" within the meaning of the Unfair

24  Competition Law because its conduct was immoral, unethical, unscrupulous, or substantially injurious to

25  consumers, and the utility of the conduct to Defendant does not outweigh the gravity of the harm to class

26  members.

27         62.     In particular, while Defendant's use of PHO in Tootsie Products may have some utility to

28  Defendant in that it allowed Defendant to realize higher profit margins than if it used only safe

1   ingredients, this utility is small and far outweighed by the gravity of the serious health harm Defendant

2   inflicted upon consumers.

3          63.     Defendant's conduct injured competing manufacturers of similar products that did not

4   engage in its unfair, immoral behavior, especially given the limited retail shelf space.

5          64.     Moreover, Defendant's practices violated public policy as declared by specific

6   constitutional, statutory, or regulatory provisions, including the FDCA, the Food Additives Amendment

7   of 1958 and California Education Code § 49431.7.

8          65.     Defendant's actions also violated public policy by causing the United States, California,

9   and every other state to pay—via Medicare, Medicaid, Affordable Care Act Exchange subsidies,

10  veterans' health programs, public employee and retiree health insurance—for treatment of trans fat-

11  related illnesses.

12         66.     Further, the injury to consumers from Defendant's practices was substantial, not

13  outweighed by benefits to consumers or competition, and not one that consumers themselves could

14  reasonably have avoided. Rather, the burden of avoiding dangerous and unapproved food additives is

15  not reasonably placed on the general public, who have varied levels of education and familiarity with

16  food safety, but rather on the manufacturers of food, both as a matter of equity and as a matter of

17  efficiency.

18         67.     These unfair acts were also oppressive and malicious. Tootsie knew PHO causes death

19  and disease, and that most candy companies did not use PHO for this reason. It nonetheless decided to

20  place its desire for profit above the health of its customers.

21  **VII.   DEFENDANT'S PRACTICES WERE "UNLAWFUL" WITHIN THE MEANING OF**

22  **THE CALIFORNIA UNFAIR COMPETITION LAW**

23         68.     Defendant's practices as described herein are "unlawful" within the meaning of the

24  California Unfair Competition Law because PHO is not Generally Recognized as Safe (GRAS).

25  Therefore, Defendant's use of PHO rendered Tootsie Products adulterated within the meaning of 21

    U.S.C. § 342(a)(2)(C).

26

27         69.     The PHO used in Tootsie Products appears nowhere on the FDA's list of the hundreds of

28

substances it considers GRAS.[33]

70. PHO also fails to meet the fundamental requirement for GRAS status—that the substance is safe. In fact, the FDA has explicitly recognized that there is no safe level of artificial trans fat consumption.

71. Under the Food Additives Amendment of 1958, which amended the FDCA, all food additives are unsafe unless they (1) fall within a specified exemption to the statute's definition of food additive, or (2) their use is pursuant to FDA approval. Because the PHOs used in Tootsie Products does not meet either of these exceptions, they are, and long have been, unsafe and unlawful for use in food.

72. Defendant's use of PHO in Tootsie Products thus constituted adulteration under 21 U.S.C. § 342.

73. On November 8, 2013, the FDA tentatively determined PHO is not GRAS.[34]

74. On June 17, 2015, after extensive public comment, the FDA determined trans fat is not GRAS.[35]

75. At no point during the class period was there a scientific consensus PHO was safe. Indeed, for more than two decades, the scientific consensus has been that it is unsafe.

76. In using PHO as a food additive prior to 2015, Defendant failed to submit a food additive petition and failed to undertake a GRAS self-determination.

77. Defendant's conduct was further "unlawful" because it violated the Federal Food, Drug and Cosmetic Act ("FDCA"), specifically,

- 21 U.S.C. § 331(a) (prohibiting the "introduction or delivery for introduction into interstate commerce of any food, drug, device, tobacco product, or cosmetic that is adulterated or misbranded");
- 21 U.S.C. § 331(b) (prohibiting the "adulteration or misbranding of any food, drug, device, tobacco product, or cosmetic in interstate commerce");
- 21 U.S.C. § 331(c) (prohibiting the "receipt in interstate commerce of any food, drug, device, tobacco product, or cosmetic that is adulterated or misbranded, and the delivery or proffered delivery thereof for pay or otherwise");
- 21 U.S.C. § 348 (prohibiting the use of any food additive unless it has been deemed GRAS).

---

[33] *See* 21 C.F.R. §§ 181, 182, 184 and 186.

[34] 78 Fed. Reg. 67169 (November 8, 2013).

[35] 80 Fed. Reg. 34650 (June 17, 2015).

78.     Defendant's conduct further violated the California Sherman Food, Drug, and Cosmetic Law Defendant's conduct also violates California's Health and Safety Code, which prohibits the manufacture, delivery, and sale of food that "contains any poisonous or deleterious substance that may render it injurious to health of man or any other animal that may consume it." *Id.* at § 110545.

## VIII.   INJURY

79.     When purchasing Tootsie Products, Plaintiff was seeking products of particular qualities, including products that did not negatively affect blood cholesterol levels or the health of her cardiovascular system, and products made with safe, lawful ingredients.

80.     Plaintiff purchased Tootsie Products believing they had the qualities she sought based on the natural assumption that food sold in stores by large companies would not have unsafe and unlawful ingredients.

81.     Instead, Tootsie Products were actually unsatisfactory to her for the reasons described herein.

82.     Plaintiff lost money as a result of Defendant's conduct because she purchased products that were detrimental to her health and were unfairly offered for sale in violation of federal and California law. Had Defendant not violated the law, Plaintiff would not have been able to purchase Tootsie Products.

83.     Plaintiff suffered physical injury when she consumed Tootsie Products, because consuming artificial trans fat in *any* quantity, including the quantity she actually consumed, inflames and damages vital organs and substantially increases the risk of heart disease, diabetes, cancer, and death.

84.     Throughout the Class Period, Tootsie Products contained an unsafe amount of artificial trans fat which rendered them unfit for their ordinary use.

85.     During the Class Period, Tootsie Products were not fit for human consumption and had a value of $0.

86.     Ms. Beasley was unaware that Tootsie Products were dangerous when she purchased them, and would not have purchased them had she known they contained a food additive that is unlawful because it causes heart disease, diabetes, and cancer.

87.     Plaintiff lost money as a result of Defendant's unlawful behavior. Plaintiff altered her

position to her detriment and suffered loss in an amount equal to the amount she paid for Tootsie Products.

## IX.    DELAYED DISCOVERY

88.    Plaintiff did not discover that Defendant's behavior was unfair and unlawful until October 2018, when she learned Defendant had been selling Tootsie Products illegally for years. Until this time, she lacked the knowledge regarding the facts of her claims against Tootsie Industries.

89.    Plaintiff is a reasonably diligent consumer who exercised reasonable diligence in her purchase, use, and consumption of Tootsie Products. Nevertheless, she would not have been able to discover Defendant's unfair and unlawful practices and lacked the means to discover them given that, like nearly all consumers, she is not an expert on nutrition and does not typically read or have ready access to scholarly journals such as The Journal of Nutrition,[36] The European Journal of Clinical Nutrition,[37] and The New England Journal of Medicine,[38] where the scientific evidence of artificial trans fat's dangers was published.

## X.    CLASS ACTION ALLEGATIONS

90.    Plaintiff brings this action on behalf of herself and all others similarly situated (the "Class"), excluding Defendant's officers, directors, and employees, and the Court, its officers and their families. The Class is defined as:

> All citizens of California who purchased in California Tootsie Products containing partially hydrogenated oil between January 1, 2010 and December 31, 2016.

91.    Questions of law and fact common to Plaintiff and the Class include:

a.    Whether Defendant's conduct constituted a violation of the unfair prong of

---

[36] Peter M. Clifton et al., *Trans Fatty Acids In Adipose Tissue And The Food Supply Are Associated With Myocardial Infarction*, 134 J. NUTR. 874, 874-79 (2004).

[37] A. Tavani et al., *Margarine intake and risk of nonfatal acute myocardial infarction in Italian women*, 51 EUR. J. CLIN. NUTR. 30–32 (1997) (estimating a 50 percent greater risk of heart attack in women with high consumption of margarine, an association "independent of body mass index, history of hypertension and hyperlipidemia").

[38] Mozaffarian, 354 NEW ENG. J. MED. at 1611 ("10 to 19 percent of CHD events in the United States could be averted by reducing the intake of trans fat").

California's Unfair Competition Law;

    b.  Whether Defendant's conduct constituted a violation of the unlawful prong of California's Unfair Competition Law;

    c.  Whether Defendant's conduct was immoral, unethical, unscrupulous, or substantially injurious to consumers;

    d.  Whether the slight utility Defendant realized as a result of its conduct outweighs the gravity of the harm the conduct caused to its victims;

    e.  Whether Defendant's conduct violated public policy as declared by specific constitutional, statutory, or regulatory provisions;

    f.  Whether the injury to consumers from Defendant's practices is substantial;

    g.  Whether the injury to consumers from Defendant's practices is outweighed by benefits to consumers or competition;

    h.  Whether Class members are entitled to restitution;

    i.  Whether Class members are entitled to an injunction and, if so, its terms; and

    j.  Whether Class members are entitled to any further relief.

92.    By purchasing Tootsie Products, all Class members were subjected to the same wrongful conduct.

93.    Plaintiff's claims are typical of the Class's claims because all Class members were subjected to the same economic harm when they purchased Tootsie Products and suffered economic injury.

94.    Plaintiff will fairly and adequately protect the interests of the Class, has no interests that are incompatible with the interests of the Class, and has retained counsel competent and experienced in class litigation.

95.    The Class is sufficiently numerous, as it includes thousands of individuals who purchased Tootsie Products in California during the Class Period.

96.    Class representation is superior to other options for the resolution of the controversy. The relief sought for each Class member is small, as little as one dollar for some Class members. Absent the availability of class action procedures, it would be infeasible for Class members to redress the wrongs done to them.

97.    Questions of law and fact common to the Class predominate over any questions affecting only individual members.

## First Cause of Action

### Unfair Competition Law, Bus. & Prof. Code §§ 17200 *et seq.*

98.    In both causes of action, Plaintiff realleges and incorporates by reference each and every allegation contained elsewhere in the Complaint, as if fully set forth herein.

### Unfair Conduct

99.    The business practices and omissions of Defendant as alleged herein constitute "unfair" business acts and practices in that Defendant's conduct is immoral, unethical, unscrupulous, and substantially injurious to consumers and the utility of its conduct, if any, does not outweigh the gravity of the harm to Defendant's victims.

100.    Further, Defendant's practices were unfair because they violated public policy as declared by specific constitutional, statutory, or regulatory provisions, including those embodied in the FDCA, California Health and Safety Code, and California Education Code.

101.    Moreover, Defendant's practices were unfair because the injury to consumers from Defendant's practices was substantial, not outweighed by benefits to consumers or competition, and not one that consumers themselves could reasonably have avoided or should be obligated to avoid.

### Unlawful Conduct

102.    Defendant has made and distributed, in interstate commerce and in this county, products that contained unlawful food additives. Tootsie Products were placed into interstate commerce by Defendant.

103.    Defendant's conduct was "unlawful" because it violated the Federal Food, Drug, and Cosmetic Act ("FDCA"), specifically, the Food Additives Amendment of 1958, which deems a food additive unsafe unless it has met two exceptions, neither of which the PHO used in Tootsie Products products has met. 21 U.S.C. §§ 348, 342.

104.    Defendant's conduct violated California's Sherman Law, because Tootsie Products contained PHO, which is a "poisonous or deleterious substance that may render it injurious to health of man or any other animal that may consume it." Health & Safety Code § 110545.

105.    The use of artificial trans fat in Tootsie Products thus constituted violations of the FDCA and the Sherman Law and, as such, violated the "unlawful prong" of the UCL.

106.    Plaintiff suffered injury in fact and lost money or property as a result of Defendant's unlawful acts: she was denied the benefit of the bargain when she decided to purchase Tootsie Products over competing products that were less expensive and/or contained no artificial trans fat.

107.    Had Plaintiff been aware of Defendant's unlawful conduct, she would not have purchased Tootsie Products.

108.    Defendant's unlawful acts allowed it to sell more units of Tootsie Products than it would have otherwise, and at a higher price, and higher margin.

109.    Plaintiff seeks an order for the disgorgement and restitution of all revenue received by Defendant from the sale of Tootsie Products and has no adequate remedy at law.

## Second Cause of Action

### Breach of Implied Warranty of Merchantability

110.    Plaintiff realleges and incorporates by reference each and every allegation contained elsewhere in the Complaint, as if fully set forth herein.

111.    Defendant, through its acts and omissions set forth herein, in the sale, marketing and promotion of the Tootsie Products, made representations to Plaintiff and the Class that Tootsie Products are safe to consume.

112.    Plaintiff and the Class bought Tootsie Products manufactured, advertised, and sold by Defendant, as described herein.

113.    Defendant is a merchant with respect to the goods of this kind which were sold to Plaintiff and the Class, and there was in the sale to Plaintiff and other members of the Class an implied warranty that those goods were merchantable.

114.    Defendant breached that implied warranty, however, in that Tootsie Products were not fit for their ordinary purpose in that they were not safe, wholesome, and legal food products.

115.    During the Class Period, Tootsie Products were not fit for human consumption and had a value of $0.

116.    As an actual and proximate result of Defendant's conduct, Plaintiff and the Class did not receive goods as impliedly warranted by Defendant to be merchantable in that they were not fit for their ordinary purpose of human consumption.

117. Plaintiff and the Class have sustained damages as a proximate result of the foregoing breach of implied warranty in the amount of Tootsie Products' purchase price.

## XI.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself, all others similarly situated, and the general public, prays for judgment against Defendant as follows:

A.   An order confirming that this class action is properly maintainable as a class action as defined above, appointing Plaintiff and her undersigned counsel to represent the Class, and requiring Defendant to bear the cost of class notice;

B.   An award of actual damages, punitive damages, and restitution of $40 million;

C.   Declaratory relied that the conduct alleged herein is unlawful;

D.   Pre-judgment, and post-judgment interest; and

E.   An award of attorney fees and costs.

## XII.   NO JURY DEMAND

Plaintiff does not request a trial by jury.

DATED: January 25, 2021

Respectfully Submitted,

*[signature]*

THE WESTON FIRM
GREGORY S. WESTON
**Counsel for Plaintiff**

**EXHIBIT B**

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
Tootsie Roll Industries, Inc.

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

Maxine Beasley, on behalf of herself and all others similarly situated

| FOR COURT USE ONLY |
|---|
| *(SOLO PARA USO DE LA CORTE)* |

**FILED BY FAX**
ALAMEDA COUNTY

January 25, 2021

CLERK OF
THE SUPERIOR COURT

By Shabra Iyamu, Deputy

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| The name and address of the court is: *(El nombre y dirección de la corte es):*  Superior Court of California, County of Alameda Oakland - Renee C. Davidson Courthouse 1225 Fallon St., Oakland, CA 94612 | CASE NUMBER: *(Número del Caso):* RG21086723 |
|---|---|

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is: *(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Gregory S. Weston, The Weston Firm, 1405 Morena Blvd., Suite 201, San Diego, CA 92110/ (619) 798-2006

| DATE: *(Fecha)* January 25, 2021 | Clerk, by *(Sec* digital *Iyamu* | , Deputy *(Adjunto)* |
|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010).)*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. [X] as an individual defendant.
2. [ ] as the person sued under the fictitious name of *(specify):*
3. [ ] on behalf of *(specify):*

   under: [ ] CCP 416.10 (corporation)          [ ] CCP 416.60 (minor)
          [ ] CCP 416.20 (defunct corporation)   [ ] CCP 416.70 (conservatee)
          [ ] CCP 416.40 (association or partnership)   [ ] CCP 416.90 (authorized person)
          [ ] other *(specify):*
4. [ ] by personal delivery on *(date)*

Page 1 of 1

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
*www.courts.ca.gov*

# EXHIBIT C

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: | FOR COURT USE ONLY |
|---|---|
| Gregory S. Weston (239944)<br>The Weston Firm<br>1405 Morena Blvd., Suite 201, San Diego, CA 92110<br><br>TELEPHONE NO.: (619) 798-2006    FAX NO. *(Optional)*: (619) 343-2789<br>ATTORNEY FOR *(Name)*: Plaintiff Maxine Beasley | **FILED BY FAX**<br>ALAMEDA COUNTY<br><br>January 25, 2021<br><br>CLERK OF<br>THE SUPERIOR COURT<br>By Shabra Iyamu, Deputy<br><br>CASE NUMBER:<br><br>**RG21086723** |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF  ALAMEDA
STREET ADDRESS: 1225 Fallon St.
MAILING ADDRESS: 1225 Fallon St.
CITY AND ZIP CODE: Oakland, CA 94612
BRANCH NAME: Oakland - Renee C. Davidson Courthouse

CASE NAME:
Beasley v. Tootsie Roll Industries, Inc.

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: |
|---|---|---|
| [x] Unlimited (Amount demanded exceeds $25,000) [ ] Limited (Amount demanded is $25,000) | [ ] Counter [ ] Joinder<br>Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | JUDGE:<br><br>DEPT.: |

*Items 1–6 below must be completed (see instructions on page 2).*

1.  Check **one** box below for the case type that best describes this case:

| Auto Tort | Contract | Provisionally Complex Civil Litigation |
|---|---|---|
| [ ] Auto (22) | [ ] Breach of contract/warranty (06) | **(Cal. Rules of Court, rules 3.400–3.403)** |
| [ ] Uninsured motorist (46) | [ ] Rule 3.740 collections (09) | [ ] Antitrust/Trade regulation (03) |
| **Other PI/PD/WD (Personal Injury/Property** | [ ] Other collections (09) | [ ] Construction defect (10) |
| **Damage/Wrongful Death) Tort** | [ ] Insurance coverage (18) | [ ] Mass tort (40) |
| [ ] Asbestos (04) | [ ] Other contract (37) | [ ] Securities litigation (28) |
| [ ] Product liability (24) | **Real Property** | [ ] Environmental/Toxic tort (30) |
| [ ] Medical malpractice (45) | [ ] Eminent domain/Inverse | [ ] Insurance coverage claims arising from the |
| [ ] Other PI/PD/WD (23) | condemnation (14) | above listed provisionally complex case |
| **Non-PI/PD/WD (Other) Tort** | [ ] Wrongful eviction (33) | types (41) |
| [x] Business tort/unfair business practice (07) | [ ] Other real property (26) | **Enforcement of Judgment** |
| [ ] Civil rights (08) | **Unlawful Detainer** | [ ] Enforcement of judgment (20) |
| [ ] Defamation (13) | [ ] Commercial (31) | **Miscellaneous Civil Complaint** |
| [ ] Fraud (16) | [ ] Residential (32) | [ ] RICO (27) |
| [ ] Intellectual property (19) | [ ] Drugs (38) | [ ] Other complaint *(not specified above)* (42) |
| [ ] Professional negligence (25) | **Judicial Review** | **Miscellaneous Civil Petition** |
| [ ] Other non-PI/PD/WD tort (35) | [ ] Asset forfeiture (05) | [ ] Partnership and corporate governance (21) |
| **Employment** | [ ] Petition re: arbitration award (11) | [ ] Other petition *(not specified above)* (43) |
| [ ] Wrongful termination (36) | [ ] Writ of mandate (02) | |
| [ ] Other employment (15) | [ ] Other judicial review (39) | |

2.  This case [x] is  [ ] is not    complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
    a. [ ] Large number of separately represented parties    d. [x] Large number of witnesses
    b. [x] Extensive motion practice raising difficult or novel    e. [ ] Coordination with related actions pending in one or more
       issues that will be time-consuming to resolve       courts in other counties, states, or countries, or in a federal
    c. [ ] Substantial amount of documentary evidence       court
                                                         f. [ ] Substantial postjudgment judicial supervision

3.  Remedies sought *(check all that apply)*: a. [ ] monetary  b. [x] nonmonetary; declaratory or injunctive relief  c. [x] punitive
4.  Number of causes of action *(specify):* Two
5.  This case [x] is  [ ] is not    a class action suit.
6.  If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*
Date: January 25, 2021
Gregory S. Weston
_____
(TYPE OR PRINT NAME)                                    (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. July 1, 2007] | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;<br>Cal. Standards of Judicial Administration, std. 3.10<br>*www.courts.ca.gov* |

1/25/2021 14:44:24 CST     To: 15102671546     From: The Weston Firm     Fax: 6193432789

Case 4:21-cv-01297-DMR   Document 1-2   Filed 02/23/21   Page 30 of 40
*Unified Rules of the Superior Court of California, County of Alameda*

F. ADDENDUM TO CIVIL CASE COVER SHEET

| Short Title: Beasley v. Tootsie Roll Industries, Inc. | Case Number: |
|---|---|

## CIVIL CASE COVER SHEET ADDENDUM

### THIS FORM IS REQUIRED IN ALL NEW <u>UNLIMITED</u> CIVIL CASE FILINGS IN THE
### SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA

|  | [  ] Hayward Hall of Justice  (447) |
|---|---|
| [ x ]  Oakland, Rene C. Davidson Alameda County Courthouse  (446) | [  ]  Pleasanton, Gale-Schenone Hall of Justice  (448) |

| Civil Case Cover Sheet Category | Civil Case Cover Sheet Case Type | Alameda County Case Type (check only one) | | |
|---|---|---|---|---|
| Auto Tort | Auto tort (22) | [  ] | 34 | Auto tort (G) |
|  |  | **Is this an uninsured motorist case?  [  ] yes  [  ] no** | | |
| Other PI /PD / WD Tort | Asbestos (04) | [  ] | 75 | Asbestos (D) |
|  | Product liability (24) | [  ] | 89 | Product liability (<u>not</u> asbestos or toxic tort/environmental) (G) |
|  | Medical malpractice (45) | [  ] | 97 | Medical malpractice (G) |
|  | Other PI/PD/WD tort (23) | [  ] | 33 | Other PI/PD/WD tort (G) |
| Non - PI /PD / WD Tort | Bus tort / unfair bus. practice (07) | [ x ] | 79 | Bus tort / unfair bus. practice (G) |
|  | Civil rights (08) | [  ] | 80 | Civil rights (G) |
|  | Defamation (13) | [  ] | 84 | Defamation (G) |
|  | Fraud (16) | [  ] | 24 | Fraud (G) |
|  | Intellectual property (19) | [  ] | 87 | Intellectual property (G) |
|  | Professional negligence (25) | [  ] | 59 | Professional negligence - non-medical (G) |
|  | Other non-PI/PD/WD tort (35) | [  ] | 03 | Other non-PI/PD/WD tort (G) |
| Employment | Wrongful termination (36) | [  ] | 38 | Wrongful termination (G) |
|  | Other employment (15) | [  ] | 85 | Other employment (G) |
|  |  | [  ] | 53 | Labor comm award confirmation |
|  |  | [  ] | 54 | Notice of appeal - L.C.A. |
| Contract | Breach contract / Wrnty (06) | [  ] | 04 | Breach contract / Wrnty (G) |
|  | Collections (09) | [  ] | 81 | Collections (G) |
|  | Insurance coverage (18) | [  ] | 86 | Ins. coverage - non-complex (G) |
|  | Other contract (37) | [  ] | 98 | Other contract (G) |
| Real Property | Eminent domain / Inv Cdm (14) | [  ] | 18 | Eminent domain / Inv Cdm (G) |
|  | Wrongful eviction (33) | [  ] | 17 | Wrongful eviction (G) |
|  | Other real property (26) | [  ] | 36 | Other real property (G) |
| Unlawful Detainer | Commercial (31) | [  ] | 94 | Unlawful Detainer - commercial  **Is the deft. in possession** |
|  | Residential (32) | [  ] | 47 | Unlawful Detainer - residential  **of the property?** |
|  | Drugs (38) | [  ] | 21 | Unlawful Detainer - drugs  **[ ]Yes   [ ]No** |
| Judicial Review | Asset forfeiture (05) | [  ] | 41 | Asset forfeiture |
|  | Petition re: arbitration award (11) | [  ] | 62 | Pet. re: arbitration award |
|  | Writ of Mandate (02) | [  ] | 49 | Writ of mandate |
|  |  | **Is this a CEQA action (Publ.Res.Code section 21000 et seq)  [  ] Yes   [  ] No** | | |
|  | Other judicial review (39) | [  ] | 64 | Other judicial review |
| Provisionally Complex | Antitrust / Trade regulation (03) | [  ] | 77 | Antitrust / Trade regulation |
|  | Construction defect (10) | [  ] | 82 | Construction defect |
|  | Claims involving mass tort (40) | [  ] | 78 | Claims involving mass tort |
|  | Securities litigation (28) | [  ] | 91 | Securities litigation |
|  | Toxic tort / Environmental (30) | [  ] | 93 | Toxic tort / Environmental |
|  | Ins covrg from cmplx case type (41) | [  ] | 95 | Ins covrg from complex case type |
| Enforcement of Judgment | Enforcement of judgment (20) | [  ] | 19 | Enforcement of judgment |
|  |  | [  ] | 08 | Confession of judgment |
| Misc Complaint | RICO (27) | [  ] | 90 | RICO (G) |
|  | Partnership / Corp. governance (21) | [  ] | 88 | Partnership / Corp. governance (G) |
|  | Other complaint (42) | [  ] | 68 | All other complaints (G) |
| Misc. Civil Petition | Other petition (43) | [  ] | 06 | Change of name |
|  |  | [  ] | 69 | Other petition |

202-19 (5/1/00)

A-13

# EXHIBIT D

The Weston Firm
Attn:  Weston, Gregory S
1405 Morena Blvd.
Suite 201
San Diego, CA   92110_____

Tootsie Roll Industries, Inc.

## Superior Court of California, County of Alameda
## Rene C. Davidson Alameda County Courthouse

Beasley

Plaintiff/Petitioner(s)

VS.

Tootsie Roll Industries, Inc.

Defendant/Respondent(s)
(Abbreviated Title)

No. <u>RG21086723</u>

NOTICE OF HEARING

To each party or to the attorney(s) of record for each party herein:

Notice is hereby given that the above-entitled action has been set for:

Complex Determination Hearing
Case Management Conference

You are hereby notified to appear at the following Court location on the date and time noted below:

Complex Determination Hearing:
DATE:  03/02/2021    TIME:  03:00 PM    DEPARTMENT:  23
LOCATION:  Administration Building, Fourth Floor
                      1221 Oak Street, Oakland

Case Management Conference:
DATE:  04/06/2021    TIME:  03:00 PM    DEPARTMENT:  23
LOCATION:  Administration Building, Fourth Floor
                      1221 Oak Street, Oakland

Pursuant to California Rules of Court, Rule 3.400 et seq. and Local Rule 3.250 (Unified Rules of the Superior Court, County of Alameda), the above-entitled matter is set for a Complex Litigation Determination Hearing and Initial Complex Case Management Conference.

Department 23 issues tentative rulings on DomainWeb (www.alameda.courts.ca.gov/domainweb). For parties lacking access to DomainWeb, the tentative ruling must be obtained from the clerk at (510) 267-6939.  Please consult Rule 3.30(c) of the Unified Rules of the Superior Court, County of Alameda, concerning the tentative ruling procedures for Department 23.

Counsel or party requesting complex litigation designation is ordered to serve a copy of this notice on all parties omitted from this notice or brought into the action after this notice was mailed.

All counsel of record and any unrepresented parties are ordered to attend this Initial Complex Case Management Conference unless otherwise notified by the Court.

Failure to appear, comply with local rules or provide a Case Management Conference statement may result in sanctions.  Case Management Statements may be filed by E-Delivery, by submitting directly to the E-Delivery Fax Number (510) 267-5732.  No fee is charged for this service.  For further information, go to **Direct Calendar Departments** at

**http://apps.alameda.courts.ca.gov/domainweb**.

All motions in this matter to be heard prior to Complex Litigation Determination Hearing must be scheduled for hearing in Department 23.

If the information contained in this notice requires change or clarification, please contact the courtroom clerk for Department 23 by e-mail at Dept23@alameda.courts.ca.gov or by phone at (510) 267-6939.

TELEPHONIC COURT APPEARANCES at Case Management Conferences may be available by contacting CourtCall, an independent vendor, at least 3 business days prior to the scheduled conference. Parties can make arrangements by calling (888) 882-6878, or faxing a service request form to (888) 883-2946. This service is subject to charges by the vendor.

Dated:  01/28/2021                    Chad Finke  Executive Officer / Clerk of the Superior Court

                          By        _A. Qhei_
                                      Digital
                                                          _____
                                                                    Deputy Clerk

**CLERK'S CERTIFICATE OF MAILING**

I certify that the following is true and correct:  I am the clerk of the above-named court and not a party to this cause.  I served this Notice by placing copies in envelopes addressed as shown hereon and then by sealing and placing them for collection, stamping or metering with prepaid postage, and mailing on the date stated below, in the United States mail at Alameda County, California, following standard court practices.

          Executed on 01/29/2021.

                          By        _A. Qhei_
                                      Digital
                                                          _____
                                                                    Deputy Clerk

# EXHIBIT E

POS-010

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):*<br>Gregory S. Weston (239944)<br>The Weston Firm<br>1405 Morena Blvd, Suite 201<br>San Diego, CA 92110<br><br>   TELEPHONE NO.: (619) 798-2006     FAX NO. *(Optional):* (619) 343-2789<br>E-MAIL ADDRESS *(Optional):*<br>ATTORNEY FOR *(Name):* Plaintiff - Maxine Beasley and all other similarly situated | **FILED BY FAX**[ILY]<br>ALAMEDA COUNTY<br><br>February 03, 2021<br><br>CLERK OF<br>THE SUPERIOR COURT<br>By Xian-xii Bowie, Deputy<br><br>CASE NUMBER:<br><br>**RG21086723** |

| | |
|---|---|
| SUPERIOR COURT OF CALIFORNIA, COUNTY OF **ALAMEDA**<br>STREET ADDRESS: 1225 Fallon Street<br>MAILING ADDRESS: 1225 Fallon Street<br>CITY AND ZIP CODE: Oakland, VA 94612<br>BRANCH NAME: Oakland - Renee C. Davidson Courthouse | |

| | |
|---|---|
| PLAINTIFF/PETITIONER: Maxine Beasley and all other similarly situated<br>DEFENDANT/RESPONDENT: Tootsie Roll Industries, Inc. | CASE NUMBER:<br>RG21086723 |

| | |
|---|---|
| **PROOF OF SERVICE OF SUMMONS** | Ref. No. or File No.: |

*(Separate proof of service is required for each party served.)*

1. At the time of service I was at least 18 years of age and not a party to this action.

2. I served copies of:
   a. [x] summons
   b. [x] complaint
   c. [x] Alternative Dispute Resolution (ADR) package
   d. [x] Civil Case Cover Sheet *(served in complex cases only)*
   e. [ ] cross-complaint
   f. [ ] other *(specify documents):*

3. a. Party served *(specify name of party as shown on documents served):*
      Tootsie Roll Industries, Inc.
   b. [x] Person (other than the party in item 3a) served on behalf of an entity or as an authorized agent (and not a person under item 5b on whom substituted service was made) *(specify name and relationship to the party named in item 3a):*
      Registered Agent, Robert A. Gouldin

4. Address where the party was served:
   909 E Main Street, Suite 1200 Richmond, VA 23219

5. I served the party *(check proper box)*
   a. [x] **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party  (1) on *(date):* 2/2/2021      (2) at *(time):* 2:30pm
   b. [ ] **by substituted service.** on *(date):*      at *(time):*      I left the documents listed in item 2 with or in the presence of *(name and title or relationship to person indicated in item 3):*

      (1) [ ] **(business)** a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served. I informed him or her of the general nature of the papers.
      (2) [ ] **(home)** a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party. I informed him or her of the general nature of the papers.
      (3) [ ] **(physical address unknown)** a person at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box. I informed him or her of the general nature of the papers.
      (4) [ ] I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served at the place where the copies were left (Code Civ. Proc., § 415.20). I mailed the documents on *(date):*      from *(city):*      or [ ] a declaration of mailing is attached.
      (5) [ ] I attach a **declaration of diligence** stating actions taken first to attempt personal service.

Page 1 of 2

POS-010

| PLAINTIFF/PETITIONER: Maxine Beasley and all other similarly situated | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: Tootsie Roll Industries, Inc. | RG21086723 |

5. c. ☐ **by mail and acknowledgment of receipt of service.** I mailed the documents listed in item 2 to the party, to the address shown in item 4, by first-class mail, postage prepaid,

    (1) on *(date):*               (2) from *(city):*

    (3) ☐ with two copies of the *Notice and Acknowledgment of Receipt* and a postage-paid return envelope addressed to me. *(Attach completed Notice and Acknowledgement of Receipt.)* (Code Civ. Proc., § 415.30.)

    (4) ☐ to an address outside California with return receipt requested. (Code Civ. Proc., § 415.40.)

  d. ☐ **by other means** *(specify means of service and authorizing code section):*

    ☐ Additional page describing service is attached.

6. The "Notice to the Person Served" (on the summons) was completed as follows:

  a. ☐ as an individual defendant.

  b. ☐ as the person sued under the fictitious name of *(specify):*

  c. ☐ as occupant.

  d. ☐ On behalf of *(specify):*

    under the following Code of Civil Procedure section:

    ☐ 416.10 (corporation)           ☐ 415.95 (business organization, form unknown)
    ☐ 416.20 (defunct corporation)        ☐ 416.60 (minor)
    ☐ 416.30 (joint stock company/association)  ☐ 416.70 (ward or conservatee)
    ☐ 416.40 (association or partnership)    ☐ 416.90 (authorized person)
    ☐ 416.50 (public entity)            ☐ 415.46 (occupant)
                                  ☐ other:

7. **Person who served papers**

  a. Name: Stuart Louder

  b. Address: 1011 E Main Street, Ste LL55 Richmond, VA 23219

  c. Telephone number: (804) 775-2100

  d. **The fee** for service was: $

  e. I am:

    (1) ☒ not a registered California process server.

    (2) ☐ exempt from registration under Business and Professions Code section 22350(b).

    (3) ☐ a registered California process server:

        ☐ owner   ☐ employee   ☐ independent contractor.

    (ii) Registration No.:

    (iii) County:

8. ☒ **I declare** under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

  **or**

9. ☐ **I am a California sheriff or marshal and** I certify that the foregoing is true and correct.

Date: 2/3/2021

Stuart Louder / Process Server
_____
(NAME OF PERSON WHO SERVED PAPERS/SHERIFF OR MARSHAL)           (SIGNATURE)

# EXHIBIT F

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**THE WESTON FIRM**
GREGORY S. WESTON (239944)
*greg@westonfirm.com*
1405 Morena Blvd., Suite 201
San Diego, CA 92110
Telephone:    (619) 798-2006
Facsimile:    (619) 343-2789

<u>Counsel for Plaintiff</u>

FILED BY FAX
ALAMEDA COUNTY

February 03, 2021

CLERK OF
THE SUPERIOR COURT
By Xian-xii Bowie, Deputy

CASE NUMBER:
**RG21086723**

**SUPERIOR COURT FOR THE STATE OF CALIFORNIA**

**FOR THE COUNTY OF ALAMEDA**

| | |
|---|---|
| MAXINE BEASLEY on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>TOOTSIE ROLL INDUSTRIES, INC.,<br><br>Defendant. | Case No: RG21086723<br><br>Pleading Type: Class Action<br><br>**PROOF OF SERVICE** |

1    I am a citizen of the United States and a resident of the State of California. I am over the age of

2 eighteen years, and not a party to this action. My business address is The Weston Firm, 1405 Morena

3 Blvd., Suite 201, San Diego, CA 92110. On February 2, 2021, I served the document described below via

4 email pursuant to agreement of counsel:

5    NOTICE OF HEARINGS (COMPLEX DETERMINATION AND CASE MANAGEMENT CONFERENCE)

6 On the following party, attorney for Defendant Tootsie Roll Industries, Inc. in this action:

7    David M. Jolley
    *djolley@donahue.com*
8    DONAHUE FITZGERALD LLP

9

10               Dave Newberry

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Beasley v. Tootsie Roll Industries, Inc.*, Case No. RG21086723
PROOF OF SERVICE

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### PROOF OF SERVICE

I declare that I am employed in the County of Oakland, State of California. I am over the age of eighteen years at the time of service and not a party to the within cause. My employment address is 1999 Harrison Street, 25th Floor, Oakland, CA 94612.

On February 23, 2021, I served copies of the attached document(s) entitled:

**DECLARATION OF DAVID M. JOLLEY IN SUPPORT OF**
**DEFENDANT TOOTSIE ROLL INDUSTRIES, LLC'S**
**NOTICE OF REMOVAL**

on the interested parties in this action, by placing a true and correct copy thereof enclosed in a sealed envelope, addressed as follows:

Gregory S. Weston
The Weston Firm
greg@westonfirm.com

X  **E-MAIL OR ELECTRONIC TRANSMISSION.** Based on a Court Order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the document(s) to be sent to the persons at the e-mail addresses listed above. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

X  **STATE.** I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on February 23, 2021, at Oakland, California.

_Candice C. Garretson_

_____
Candice C. Garretson

---

PROOF OF SERVICE                                    CASE NO. C16-02440